IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CHERRI LYNN FRAZIER,

        Petitioner,                No. CIV S-97-2196 LKK CHS P

      vs.

TINA FARMON,

        Respondent.        <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

I.    <u>INTRODUCTION</u>

        Petitioner Cherri Frazier is a state prisoner proceeding with counsel on a second amended petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Frazier attacks her March 16, 1994 conviction in the Solano County Superior Court, case number C35712, for conspiracy to commit first degree murder.

II.    <u>ISSUES</u>

        Petitioner's May 14, 2009, second amended petition raises three issues as follow, verbatim:

            A.    Violation of Due Process under the Fifth and Fourteenth Amendment and the right to a jury verdict by failure to instruct the jury on conspiracy to commit a lesser offense;

1

1

2          B.      Violation of Due Process under the Fifth and Fourteenth
                   Amendment and the right to a jury verdict by failure to instruct the
3                  jury on the requested lesser related offense instruction on
                   Accessory After the Fact; and

4          C.      The accumulation of error rendered her conviction fundamentally
                   unfair and a violation of her rights to Due Process under the Fifth
5                  and Fourteenth Amendments to the U.S. Constitution.

6          Upon careful consideration of the record and the applicable law, the

7   undersigned will recommend this petition for habeas corpus relief be denied.

8   III.   FACTUAL AND PROCEDURAL HISTORY

9          A.      Facts[1]

10   _____

11         [1] This statement of facts is taken from the July 1, 1996 opinion by the California Court of Appeal
12   for the First Appellate District (hereinafter Opinion), lodged with respondent's answer as Exhibit L, Part 1.
     The murder of Hop Summar resulted in the prosecution of multiple defendants, in separate trials, one of
13   which involved two different juries.  Frazier was tried along with Sue Hamby and Robert Fenenbock in
     front of a common jury.  This statement of facts from the California Court of Appeal is drawn from only the
14   facts presented at Frazier's trial and presented to the jury that determined Frazier's guilt, unlike the
     statement of facts from the California Court of Appeal opinion concerning Bond and MacCarlie, where that
15   court consolidated the appeals of Bond, MacCarlie, Adcock and Lockley, resulting in a single statement of
     facts that not only referenced the testimony heard by the Bond jury and the MacCarlie/Dodds jury, but also
16   the testimony heard by the Adcock/Lockley jury.  That is why the California Court of Appeal statement of
     facts may be relied upon here, but not in the Bond (99-cv-2150) and MacCarlie (00-cv-1830) Findings and
     Recommendations.

17
           Frazier argues however that because the prosecution's theory regarding the homicide was false,
18   and because this theory "permeates the lower court opinion . . . it is not possible to rely solely upon the
     facts" as summarized in the July 1, 1996 opinion.  Second Amended Petition at 8.  Frazier instead draws
19   facts from the opinion, her trial, the trials of other defendants, and from "evidence unmentioned in these
     lower court opinions . . ." Id.

20
           On federal habeas review, "a determination of a factual issue made by a State court shall be
21   presumed to be correct" unless rebutted by the petitioner by clear and convincing evidence.  28 U.S .C. §
     2254(e)(1).  See also Schriro v. Landrigan, 550 U.S. 465, 473-74 (2007) ("AEDPA also requires federal
22   habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this
     presumption with 'clear and convincing evidence.' ") (citing Section 2254(e) (1)); Pollard v. Galaza, 290
23   F.3d 1030, 1033, 1035 (9th Cir. 2002) (statutory presumption of correctness applies to findings by both
     trial courts and appellate courts); Dubria v. Smith, 224 F.3d 995, 1000 (9th Cir. 2000) (en banc).

24
           "Clear and convincing evidence" within the meaning of § 2254(e) "requires greater proof than
25   preponderance of the evidence" and must produce "an abiding conviction" that the factual contentions
     being advanced are "highly probable." Cooper v. Brown, 510 F.3d 870, 919 (9th Cir. 2007) (quoting
26   Sophanthavong v. Palmateer, 378 F.3d 859, 866 (9th Cir. 2004)).  Here, Frazier has not presented
     evidence that would permit the presumption of correctness that has attached to the State court's factual

2

The events occurred in Hawkins Bar, a small hamlet located on Highway 299 in Trinity County.  Hawkins Bar consists of a general store, a set of BP gasoline pumps adjoining the store, and a bar (Simon Legree's) located across the highway from the store.  Next to the store was a trailer park.  It was here that Barbara Adcock lived with Bernard "Bird" MacCarlie and her three children from a prior marriage.

Below the highway, along the river, was a United States Forest Service campground accessible by a service road.  In September and October 1991 a group of people were camped in the campground.  They were described by local residents as drunk and violent, especially wild and out of control.  Some of the campers had been there several weeks; some were drifters.  One couple had come to get married at the Harvest Moon Festival on October 5.  Defendant Cherri Frazier was there to attend the wedding.  Some of the local residents-including Adcock, MacCarlie and defendants Fenenbock and Hamby-spent time at the campground.

*The Prosecution's Case*

It was the prosecution's theory that Hop Summar was killed by a mob from Hawkins Bar seeking to avenge an alleged act of child molestation upon Barbara Adcock's daughter.

*The Victim*

Hop Summar was a pathetic figure.  Crippled from numerous childhood orthopedic surgeries, he walked with a limp (hence the nickname, "Hop").  Though he was in his 30's, he was physically frail, wore a colostomy bag, and had a rather meek disposition.  He lived on SSI (Supplemental Security Income) and drank to excess nearly every day.  He seldom bathed and was distinctive for his offensive body odor.

Hop had known Bird MacCarlie for several years, and he often lived with Bird in the trailer Bird shared with Barbara Adcock and her children.  Sometimes Hop looked after Adcock's children while Adcock was partying at the campground.

*The Molestation Accusations*

On September 30, 1991, Barbara Adcock reported to the Trinity County Sheriff's Department that Hop Summar had molested her five-year-old daughter Rachelle H.  (Ultimately neither the sheriff nor the county's Child Protective Services

findings to be set aside.

found any evidence that Rachelle had been molested.) Adcock and Bird MacCarlie then proceeded to spread the accusations among the denizens of Hawkins Bar.

*Solicitation of Mike Sutton*

Defendant Cherri Frazier arrived at the Hawkins Bar campground on September 30. She was there to attend the wedding of Leafe and Michelle Dodds. Frazier had camped at Hawkins Bar earlier that summer.

Almost immediately upon her arrival, Frazier encountered Barbara Adcock, who told her of the molestation of Rachelle. That same day, or the following day, Frazier gave a ride to Mike Sutton, a drifter also camping at Hawkins Bar. During the ride Sutton noticed a blue-handled knife on the dashboard. Frazier said, "I'm going to go and cut off Hop's balls." Frazier asked Sutton to come with her, but he refused. She then told him to "stay out of it."

In that same ride, Frazier told Bert Jones (another transient camped at Hawkins Bar) that she needed to do something about Hop's molestation of Barbara Adcock's daughter; that she would drag Hop into the woods herself and kill him if she had to.

On the evening of October I, Mike Sutton was in the campground and heard Bird MacCarlie, Barbara Adcock and "Redbeard" Bob Bond discussing how to kill Hop. Barbara Adcock was sitting at a picnic table with defendants Cherri Frazier and Sue Hamby. Barbara and Cherri asked Sutton if he wanted to be in on it, as they weren't getting any help from the others. He declined. As he walked away from the group of women, Sutton heard the women discussing that defendant Sue Hamby was to keep Hop at her house so that Barbara Adcock could find him once she rounded up help to hurt him. Later that night, Sue Hamby apologized to Mike Sutton for being so forward in the conversation.

*The Assaults Upon Hop*

On October 1, Hop went into Arcata and withdrew $600 in cash from his bank account. About 5:30 in the evening, he returned to Hawkins Bar, having hitched a ride. The driver dropped him at the BP pumps. As Hop tried to enter the trailer where he resided with MacCarlie and Adcock, a group approached him and began to call him a rapist and a child molester. Included in the group were MacCarlie, Adcock, defendant Fenenbock, defendant Frazier and others. As the crowd egged her on, a woman named April May Gault chased Hop, caught up with him when he stumbled, and

4

beat him.

The attendant at the BP pumps did not see the beating, but he saw Hop just afterward. His face was cut and bleeding. Hop told him April May had hit him with a beer can.

Sometime later, Hop was assaulted again. About 6:00 he went into Simon Legree's, the town bar. The bartender and patrons observed that Hop's face was cut and bleeding. Hop told the bartender that Harry Darr had struck him in the face with a pistol because he had refused to get into Darr's truck.

Indeed, just beforehand, Harry Darr had come into Maeolla Berry's trailer in the trailer park. When he left, he jumped into his truck and rode across the highway. Maeolla Berry could see a gun in the truck. Hop Summar was standing across the street. Maeolla Berry did not see Darr get out of his truck, but she heard Hop yelling for help, and she saw Darr drive off as patrons of the bar came out to help.

*Defendant Hamby's Role*

Defendant Sue Hamby lived in a trailer east of Hawkins Bar. Her friend, Michael "Scarecrow" Roanhouse, lived in a second trailer on Hamby's property. She gave him food in exchange for repairwork on the property. Hamby was engaged to marry Tex Lockley.

On the morning of October 1, Barbara Adcock and her children appeared at Hamby's trailer. Adcock told Hamby her accusations against Hop Summar. After Adcock left, Hamby told Scarecrow Roanhouse, but Scarecrow said he didn't believe Adcock's story.

That afternoon, Hamby went to Maeolla Berry's trailer and asked for her advice. Hamby told Maeolla Berry that she was supposed to keep Hop in her trailer and let Barbara Adcock know so that Adcock could call the police. Berry advised Hamby to call the police herself.

After their conversation, Berry drove Hamby to the campground so Hamby could retrieve her truck. On the way Hamby telephoned Hop to tell him to stay where he was, at Simon Legree's, and she would pick him up. Later that evening, Hamby and Scarecrow Roanhouse came into Simon Legree's. Hop was dozing on his bar stool, with his purple backpack at his side. When he awoke, Hamby got him into her truck and drove him to her trailer. He slept on her couch. The next morning, Hamby left her trailer and went to the campground. According to her testimony,

Hamby told Scarecrow to keep an eye on Hop in case the police arrived.

*The Confrontation with Hop*

Hop did not stay in Hamby's trailer.  About 6:15 or 6:30 p.m. Tex Lockley and Scarecrow Roanhouse were driving in Lockley's red flatbed truck from the general store down to the campground when they saw Hop on the access road. They stopped and gave him a ride in the back.  Hop was carrying his purple backpack.[FN]

> FN. Tex Lockley's truckbed was bloodied from the carcass of a wounded pit bull dog.

As the truck approached the campground, however, a group angrily came toward the truck, shouting, "Get him out of here."  Barbara Adcock shook a baseball bat, yelling, "Get the fuck on out of here."  Tex Lockley shifted quickly into reverse and backed the truck up the hill to the highway.

Scarecrow Roanhouse testified that as the truck reached the top of the hill and the passengers got out, defendant Fenenbock and Redbeard Bob Bond walked toward the truck.  The two men walked up to Hop and struck him in the face.  Redbeard Bob hit him in the mouth; defendant Fenenbock hit Hop in the eye.  They accused Hop of being a child molester, and Hop replied, "Not guilty.  Not guilty."

At this point Steven Thayer was walking up the access road and passed the red truck.  As he did so, he saw Bird MacCarlie and Leafe Dodds drive up in Barbara Adcock's white Ranchero.[FN2]  They, too, talked to Hop, and Hop replied that he hadn't done anything.  Hop asked, "What are you going to do?  Kill me here?  Throw me in the bushes or something?"  Bird MacCarlie replied, "Yeah, something like that."  Steven Thayer testified that when last he saw Hop, Hop was seated inside the Ranchero between Redbeard Bob Bond and Bird MacCarlie.  The Ranchero pulled out onto the highway and headed east.  The red truck followed.

> FN. Meanwhile, Mike Sutton was in the campground and saw Bird MacCarlie leave in the white Ranchero with Randy H. part way under some blankets in the back.  Defendant Fenenbock was not in the campground.  He showed up later that evening, along with Bird MacCarlie, Redbeard Bob Bond, and Tex Lockley.

*The Murder*

Barbara Adcock's son, Randy H., Jr., then age 9, was sleeping on a mattress in the back of the white Ranchero. He testified that after stopping at the top of the hill the Ranchero drove to a place where the men started stabbing Hop.  The men included Bird MacCarlie, defendant Fenenbock, Redbeard Bob Bond and Leafe Dodds. Afterwards the men dragged Hop to another spot.

Four days later, on October 6, Hop Summar's body was discovered at a logging site.  The body was covered with branches and dirt.  A piece of rope was found nearby and there were ligature marks on Hop's arms, suggesting he had been tied and dragged.  Two logs found nearby were bloodied with Hop's blood.  A bloody knife was found 50 to 75 feet away.  The blood was Hop Summar's.  The knife was the same one used by Bird MacCarlie earlier on October 2 to stab Bert Jones.  Faint tire marks consistent with Tex Lockley's red truck (but not the Ranchero) were found in the roadway at the end of the drag marks.

Hop Summar died of multiple stab wounds and bludgeoning. His genitals showed signs of severe trauma from a blunt instrument.  Numerous bones in his face were fractured.  His left ear had been cut off while he was still alive.  He had been stabbed 18 times in the skull, 13 times in the chest. His left eye had been cut out.  His arm and leg had been stabbed, bringing the total stab wounds to over 70.

*The Stabbing of Bert Jones*

Earlier on the day of the murder, on October 2, Bert Jones, a drifter staying in the campground, got into an altercation with Michelle Dodds.  Defendant Cherri Frazier intervened by pushing Jones and demanding that he leave.  Barbara Adcock came at Jones with a baseball bat.  Jones retreated to his camp about a quarter of a mile from the main campground to pack up and leave.

That evening, Bird MacCarlie and Tattoo Ernie Knapp having heard about Jones's run-in with Michelle Dodds, drove in the Ranchero to Jones's campsite.  Bird MacCarlie jumped out of the car and immediately began stabbing Jones.  Bird MacCarlie forced Jones and his camp-mate, Steven Thayer, into the Ranchero, and they drove back to the main campground.  When Jones got out of the car, Bird MacCarlie put a knife to his ear and threatened to cut it off.  Harry Darr eventually intervened and told Jones to leave.  Throughout the assault upon Jones, Barbara Adcock castigated Jones for defending Hop.[FN]

7

> FN. A couple of days earlier, when accusations
> were circulating about Hop's molestation, Bert
> Jones had expressed his view to the group at
> the campground that he didn't believe Hop was
> guilty. After that, Bert Jones felt unwelcome at
> the campground, shunned by the others.

Bert Jones and Steven Thayer separately walked up the access road to Hawkins Bar.  (It was on this walk that Thayer observed the confrontation between the men in the white Ranchero and Hop Summar.)  At the general store Jones showed his stab wound to some people, and one man drove them to the nearest hospital in Willow Creek.  There Jones called 911.

Jones told the responding sheriff's deputy that a man named "Hopalong" was going to be killed or injured.  As a result of Jones's report, sheriff's deputies descended upon the campground to investigate.  They did not find Hop's body.  (It was not discovered until October 6, by a local resident searching for wood.) But they did uncover some incriminating pieces of evidence.

*The Investigation*

When various officers (from Humboldt and Trinity County Sheriff's Departments, the California Highway Patrol, the Department of Forestry) arrived in Hawkins Bar, the white Ranchero was parked at the top of the access road with Bird MacCarlie in the front seat.

Sergeant Kartchner, the investigating officer, first checked several places he thought he might find Hop-Sue Hamby's trailer, Bird MacCarlie's trailer, and adjoining trailers.  In the trailer occupied by Ron Ammon and Ila Olson he found Redbeard Bob Bond and defendant Fenenbock, both drunk and disheveled.  Neither had seen Hop, they said.

Sergeant Kartchner headed for the campground.  On the way, he passed the white Ranchero with Bird MacCarlie at the wheel. Sergeant Kartchner stopped to talk to MacCarlie, and within a few minutes Randy H. popped up from beneath some blankets in the back of the truck; he then sank back down again.

A trail of blood drops led from underneath the Ranchero to a larger area of blood near some beads and scalp hair.  The officers asked MacCarlie to move the Ranchero so they could get a better look, but MacCarlie told them the truck was inoperable.  The officers pushed the vehicle forward.

8

Bird MacCarlie had a fresh cut on his index finger.  He wore a knife sheath, but the sheath was empty.  He was barefoot and wearing a clean Hard Rock Cafe T-shirt. MacCarlie was eventually placed under arrest that night.

Down in the campground, Sergeant Kartchner interviewed several people.  Tex Lockley had a bloody knife and was arrested.  Deputy Rist was assigned to stand by defendant Sue Hamby while she was waiting to be questioned.  The deputy observed and seized a large buck knife in her back pocket.  Human blood was later detected on the knife.

Mike Sutton told Sergeant Kartchner that night that he knew nothing.  Later, however, he provided much of the incriminating evidence against defendants.

*The Aftermath*

Mike Sutton testified that on the night of October 2, Tex Lockley returned to the campsite and said to Barbara Adcock, "It's done." Defendant Cherri Frazier replied, "Good."  Barbara Adcock told them both to "shut up."

Defendant Fenenbock lived in a trailer on the property of Sid Smith.  Redbeard Bob Bond and defendant Fenenbock were dropped off at the Smith residence about 8 p.m. that night by Bird MacCarlie driving the white Ranchero.[FN]  Fenenbock told Patsy Brown, Sid Smith's wife, "You don't have to worry about that child molester anymore.  We took care of him." Patsy Brown later told Sergeant Kartchner that two women were in the back seat of the Ranchero, and she heard Cherri Frazier's voice.

> FN. This evidence-from Patsy Brown and from a neighbor of Sid Smith's-corroborates the testimony of Randy H., who said that after the killing Bird drove to Sid Smith's and dropped off Redbeard Bob and defendant Fenenbock.

The next day, October 3, defendant Fenenbock, Redbeard Bob Bond, and Barbara Adcock arrived at the home of Sue Mendes in Willow Creek.  Fenenbock gloated that the "cops didn't even check [his] hands for blood."  When Sue Mendes commented that she hoped Hop's body was not in locations where she hunted for mushrooms with her children, both Fenenbock and Redbeard Bob told her not to worry about it.

*The Back Pack*

On the morning of October 3, Mike Sutton saw defendant Sue Hamby rummaging through the back of Tex Lockley's

red truck. She pulled out a backpack, which she said was Hop's.

Scarecrow Roanhouse also saw Hamby with the backpack. He saw her open it, search through it, then wipe the outside with a wet cloth.  She asked Scarecrow to burn it, but he refused.  According to Scarecrow, Mike Sutton suggested cutting it into pieces.

That afternoon, Hamby approached Deputy Litts in the campground and told him she wanted to turn over Hop's backpack. He picked it up from her house that evening. Hamby told him Hop had given it to her the day before.  The backpack was stained with Hop's blood.

*The Physical Evidence*

Although the white Ranchero was observed near a pool of blood on the night of October 2, Sergeant Kartchner did not notice anything of evidentiary value, and the car was not seized until late October. By then there were no traces of blood.

Tex Lockley's red truck, however, was seized after a sheriff's deputy noticed blood on it.  Blood splatters were found inside the truck, as if numerous blows had been struck there.  And blood stains were found several places on the exterior of the truck.  There was also blood on the driver's seat, smeared as if someone sat in it. And there were blood stains on the seat of Tex Lockley's pants. Rope was also found in the back of the truck.

A shovel found in the red truck had a mixture of blood matching Hop's blood and Bird MacCarlie's blood.  Bird MacCarlie had a fresh cut on his finger when he was arrested on October 2.  The prosecutor theorized that Bird cut himself burying Hop.

Defendant Fenenbock was arrested the following day, on October 3, on an outstanding warrant.  He had a bloody knife which was seized by police.  The blood could not be proven to be human.

A $20 bill and a $100 bill in the police inventory were found to be stained with Hop's blood.  Bird MacCarlie had $525.59 when he was arrested.  Defendant Fenenbock had $32.96. (The booking procedures used by the Trinity County Sheriff's Department do not isolate particular bills taken from prisoners.)

*Fenenbock's Defense*

Defendant Fenenbock testified that he first heard of the molestation allegations on the morning of October 2.  He heard Barbara Adcock tell the group about the molestation, and when someone asked, "What are you going to do about Hop?"  Barbara Adcock said the police were looking for him and if anything happened to him, she and Bird would be the first ones the police would come to.

Fenenbock admitted confronting Hop that afternoon with Redbeard Bob Bond at the top of the access road.  He claimed that he tried to calm Redbeard Bob down and restrained him from hitting Hop. Fenenbock admitted punching Hop once, but only after Hop swung his backpack at him.

Fenenbock saw the white Ranchero drive up with Bird MacCarlie driving and Leafe Dodds and Harry Darr in the back seat.  There was also a yellow Toyota truck with someone in the driver's seat.[FN] Fenenbock, however, left the scene and went back down to the campground. Redbeard Bob Bond and Harry Darr came with him. Later, Bird MacCarlie returned to the campground and gave defendant Fenenbock and Redbeard Bob Bond a ride back to Fenenbock's trailer on Sid Smith's property.

> FN. Tattoo Ernie Knapp had a yellow pickup truck.

Trena Knapp, wife of Tattoo Ernie Knapp, testified that after the confrontation with Bert Jones she saw Bird MacCarlie drive the white Ranchero out of the campground with Redbeard Bob Bond and Leafe Dodds, but it returned five minutes later.  After dinner, about 8:30, Bird MacCarlie, Redbeard Bob Bond, and defendant Fenenbock left in the Ranchero with Randy H. asleep in the back.

*Frazier's Defense*

Defendant Frazier testified that she gave a ride to Mike Sutton on September 30, but she did not discuss the molestation accusations with Sutton or threaten Hop.  In fact, she did not know about the molestation at that time.  She gave Mike Sutton and Bert Jones a ride again on October 1, but there was no conversation about Hop.

Frazier was at the picnic table when Barbara Adcock complained that the authorities weren't going to do anything. But Frazier denied discussing how to kill Hop or asking Mike Sutton or Bert Jones if they wanted to be involved.

11

When Hop came into the campground in Tex Lockley's truck, Frazier took Rachelle H. and the two boys into the bathroom at Barbara Adcock's request. She heard Redbeard Bob Bond yell that Hop was at the top of the hill. And she saw Bird MacCarlie, Redbeard Bob Bond, Leafe Dodds and Randy H. leave the campground in the Ranchero.

Frazier and Michelle Dodds then drove into Willow Creek to buy some tequila. They passed Bert Jones and Steven Thayer hitchhiking on the highway. Frazier testified that she drank too much tequila and passed out for about three hours. When she awoke, she saw Bird MacCarlie, Redbeard Bob Bond, defendant Fenenbock and others in the campground. Bird MacCarlie was wearing no shirt and his hair was wet. He said he had stabbed Hop.

The next day Frazier asked Barbara Adcock what happened to Hop, and Barbara Adcock traced her finger across her throat. Frazier also heard Barbara Adcock and Sue Hamby discussing where the body was located, whether the police would ever find the body.

A few days later, Frazier was riding in the Ranchero with Barbara Adcock when Adcock asked Frazier to look around and see if there was any blood on the door or dashboard. Frazier didn't see any.

*Hamby's Defense*

Defendant Sue Hamby testified that she and Hop were friends. He showed up at her house on September 29 and joined her and Scarecrow Roanhouse for a barbecue. Hop spent the night on her couch. The next day she dropped him off near the trailer park.

On October I, Barbara Adcock arrived at Hamby's trailer and told Hamby that Hop had molested Rachelle. Barbara Adcock said she had told the police Hop was staying at Hamby's house and the police were on their way. Hamby replied that Adcock was misinformed; that she (Hamby) did not know where Hop was. Adcock asked Hamby not to tell Hop that the police were coming for him.

That night Hamby went into Simon Legree's bar to use the phone. Hop was there, passed out at the bar. Hop's face had been beaten. Hop told Hamby he had been called a rapist, and he asked Hamby if he could stay at her house for the night. Hop got into the back of her truck, and she drove him to her house. He slept on her couch. When Hamby left the next morning, Hop was still asleep on her couch. She never saw him again.

Hamby went to the campground to see why Hop had been beaten. When she got there, Barbara Adcock complained that the police weren't going to do anything about the molestation of her daughter.

Hamby disputed the testimony of Mike Sutton.  Hamby denied asking Barbara Adcock or others whether she should keep Hop at her place.  When Barbara Adcock asked Hamby where Hop was, Hamby lied and said she did not know.  Later, Michelle Dodds asked Hamby if she was going to keep Hop at her place until Hop could be dealt with. Hamby replied that she was not keeping Hop at her house; that she did not know where Hop was.  Hamby denied apologizing to Mike Sutton for soliciting his help.

Hamby left the campground, and when she returned the confrontation with Bert Jones had just concluded.  Barbara Adcock was yelling and screaming, and she yelled at Hamby that she was "going to kick [her] ass."  Hamby did not see Hop come down into the campground.  She was in the bathroom, but she heard Barbara Adcock shout "Get him out of here."  When Hamby emerged from the bathroom, Cherri Frazier was entering with the [] children.

Hamby heard but did not see the Ranchero leave the campground. Hamby herself left the campground with Scarecrow and Trena Knapp to get a grill for the barbecue.

On October 3, the day after Hop disappeared, Hamby was in the campground talking with Barbara Adcock, and Hamby told Adcock, "They are not going to find anybody ... with a helicopter." What she meant was that a helicopter would be useless for finding Hop in the forest.

Hamby denied taking Hop's backpack from Tex Lockley's truck. She denied wiping blood or fingerprints off Hop's backpack.  What Scarecrow Roanhouse saw her cleaning was dirt (Scarecrow's footprints) from her own purse. Hamby did turn in Hop's backpack to Deputy Litts-the backpack Hop had left in her trailer.

/////

Opinion at 2-14.

B.  State Court Proceedings

Nine persons, Robert Bond, Bernard MacCarlie, Leafe Dodds, Robert Fenenbock, Ernest Knapp, Anthony Lockley, Barbara Adcock, Cherri Frazier, and Sue Hamby were charged in December of 1991 and October of 1992 with various crimes

13

relating primarily to the death of Gary Hop Summar.  There were extensive and voluminous pretrial proceedings.  Ultimately all charges as to Ernest Knapp were dismissed.  The remaining eight persons were tried in three separate cases in two different counties.  Frazier was tried together with Hamby and Fenenbock in front of a common jury.  With the exception of Dodds, all were convicted of various offenses, and the post-trial proceedings were eventually concluded.

C.      Federal Court Proceedings

Frazier's federal habeas corpus proceeding has been pending for a decade, consumed by the vast state record, the five related federal cases pending in this Court, and overwhelming procedural issues.  On September 9, 2005, Magistrate Judge Dale A. Drozd held a hearing, resulting in a lengthy report and recommendation resolving complex procedural matters, particularly the respondent's motion to dismiss, involving circuitous issues concerning the timeliness of multiple claims.  Judge Drozd's comprehensive report of September 11, 2006, was adopted by Senior United States District Judge Lawrence K. Karlton on July 6, 2007.

On March 16, 2009, the Court having resolved the labyrinthine procedural questions, Frazier was given time to file a second amended petition raising the three claims remaining in the case.  Respondent's answer was filed on July 14, 2009, and Frazier filed her traverse on August 13, 2009.  This matter is therefore now ready for resolution.

/////

IV.     APPLICABLE STANDARD OF HABEAS CORPUS REVIEW

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).

/////

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Although "AEDPA does not require a federal habeas court to adopt any one methodology," Lockyer v. Andrade, 538 U.S 63, 71 (2003), there are certain principles which guide its application.

First, the "contrary to" and "unreasonable application" clauses are different. As the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams [v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002). It is the habeas petitioner's burden to show the state court's decision was either contrary to or an unreasonable application of federal law. Woodford v. Visciotti, 537 U.S. 19, 123 S. Ct. 357, 360 (2002). It is appropriate to look to lower court decisions to determine what law has been "clearly established" by the Supreme Court and the reasonableness of a particular application of that law. See Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 2000).

/////

1    Second, the court looks to the last reasoned state court decision as the

2  basis for the state court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).

3  So long as the state court adjudicated petitioner's claims on the merits, its decision is

4  entitled to deference, no matter how brief.  Lockyer, 538 U.S. at 76; Downs v. Hoyt, 232

5  F.3d 1031, 1035 (9th Cir. 2000).

6    Third, in determining whether a state court decision is entitl deference, it is

7  not necessary for the state court to cite or even be aware of the controlling federal

8  authorities "so long as neither the reasoning nor the result of the state-court decision

9  contradicts them."  Early v. Packer,  537  U.S. 3, 8 (2003).  Moreover, a state court

10  opinion need not contain "a formulary statement" of federal law, so long as the fair

11  import of its conclusion is consonant with federal law.  Id.

12  V.    DISCUSSION OF PETITIONER'S CLAIMS

13    A.    *Lesser Indluded* Instruction

14        1)    Description of Claim

15    Frazier argues that, based on the testimony of Michael Sutton and Bert

16  Jones, the trial court had a sua sponte obligation under California law to instruct the jury

17  on lesser included target offenses.  Second Amended Petition at 27.  Frazier argues

18  that it "was a denial of her federal and state constitutional rights to due process for the

19  trial court not to instruct on the lesser included offenses of conspiracy to assault or

20  batter Hop . . ."  Id. at 27-28.  It was also, she argues, a "violation of federal due

21  process for the court not to instruct on the lesser included offense of conspiracy to

22  commit voluntary manslaughter."  Id. at 28.

23        2)    State Court Opinion

24     While Frazier did not specifically raise this claim to the California Court of

25  Appeal, she joined in with all issues raised by her co-appellants, Hamby and

26  Fenenbock, in her Appellants Opening Brief.  Answer, Exhibit P at 40. The California

1   Court of Appeal rejected this claim [as raised by co-defendant Hamby and adopted by

2   Frazier], stating:

> We agree with the Attorney General that the record does not
> indicate that instructions on lesser target offenses were
> requested below.  However, the Attorney General
> acknowledges that the trial court has a sua sponte obligation
> to instruct on lesser included target offenses if there is
> evidence from which the jury could find a conspiracy to
> commit a lesser offense.  Under Penal Code section 182, the
> jury must determine which felony the defendants conspired
> to commit.  The jury cannot perform that task unless it is
> instructed on the elements of the offense the defendants are
> charged with conspiring to commit and any lesser offenses
> which the jury could reasonably find to be the true objects of
> the conspiracy.
>
> Defendant Hamby argues in her brief that instructions should
> have been given on conspiracy to commit second degree
> murder.  She reasons as follows: The jury could have found
> that the conspiracy into which she entered was a conspiracy
> to hurt Hop Summar-to punish him, yes, but not to kill him.
> Because coconspirators are liable for the reasonably
> foreseeable consequences of the planned offense and
> because death was a reasonably foreseeable consequence
> of the plan to inflict physical harm, the jury could have found
> a conspiracy to commit second degree murder.
>
> Hamby's reasoning is faulty.  The principle that conspirators
> are liable for the reasonably foreseeable consequences of
> the planned offense would render Hamby liable for the
> *substantive* offense of second degree murder, not for
> conspiracy to commit second degree murder.  The offense of
> conspiracy requires not only the intent to conspire, but also
> the specific intent to commit the planned offense.  Under
> Hamby's theory, the conspirators had no specific intent to
> kill; thus, they could not be convicted of conspiracy to
> murder.
>
> The more logical argument underlying Hamby's theory is that
> the jury should have been instructed on conspiracy to
> commit offenses other than murder, e.g., assault, battery, or
> mayhem.  We requested supplemental briefing on whether
> assault, battery, and mayhem qualify as offenses necessarily
> included within the charged target offense of murder.  We
> conclude they do not.[FN]
>
>> FN.  Because no instructions were requested,
>> we do not decide here whether the offenses of
>> assault, battery, or mayhem would qualify as

lesser *related* target offenses to justify instructions upon request.

An offense is necessarily included in the charged offense if (1) under the statutory definition of the charged offense the charged offense cannot be committed without committing the lesser offense, or (2) the charging allegations of the accusatory pleading include language describing the offense in such a way that if the charged offense was committed as specified, the lesser offense was necessarily committed.

Here, the parties concede that neither assault, nor battery, nor mayhem qualify as offenses included within the statutory definition of murder. However, defendants Hamby and Frazier argue in their supplemental briefs that the offenses qualify as lesser included target offenses by virtue of language in the information describing the overt acts.[FN] We are not persuaded.

> FN. Specifically, the third amended information charged that defendants "did conspire together to murder Gary L. 'Hop' Summar and thereafter in furtherance of said conspiracy ... did commit the following overt acts: ... [¶] [A] number of conspirators talked in the Hawkins Bar Campground of what was to be done to suspected child molester Gary L. 'Hop' Summar.... [¶] [Bird] MacCarlie went around to different individuals asking if they were 'in on it or not.' ... [¶] [Redbeard Bob] Bond called Gary L. 'Hop' Summar a child molester and hit him.... [¶] [Defendant] Fenenbock called Gary L. 'Hop' Summar a child molester and hit him.... [¶] [A] conspirator bound Gary L. 'Hop' Summar's arms.... [¶] [A] conspirator cut off one of Gary L. 'Hop' Summar's ears.... [¶] [A] conspirator gouged out one of Gary L. 'Hop' Summar's eyes.... [¶] [A] conspirator broke bones in Gary L. 'Hop' Summar's face.... [¶] [A] conspirator broke one of Gary L. 'Hop' Summar's ribs.... [¶] [A] conspirator hit Gary L. 'Hop' Summar in the testicles.... [¶] [C]onspirators repeatedly stabbed Gary L. 'Hop' Summar with knives."

In People v. Marshall (1957) 48 Cal.2d 394, 405, the Supreme Court first authorized using the language of the accusatory pleading as a yardstick for measuring what offenses qualify as "necessarily included" offenses for purposes of deciding whether the defendant could properly be convicted of a lesser offense. The Supreme Court

reasoned that when the charging allegations reveal all the elements of a lesser offense, the defendant is fairly put on notice that he should be prepared to defend against a showing that he committed the lesser offense.  (Id. at pp. 399, 405 [defendant charged with robbery of an automobile could be convicted of lesser offense of auto theft].)

Here, in the context of deciding whether the trial court was obligated to instruct sua sponte on lesser included offenses, we conclude that allegations of overt acts committed in furtherance of the alleged conspiracy do not provide notice of lesser included target offenses.

For the crime of conspiracy, the criminal act is the agreement.  The agreement is not punishable unless some overt act was committed in furtherance of the conspiracy.[FN] But the overt act itself need not be committed by the defendant, and it need not be a criminal offense.  "To render him guilty it is not necessary that a conspirator perform some act which is in itself unlawful in carrying out the criminal conspiracy.  If there is a conspiracy to commit murder by means of poison sent through the mail, a conspirator may not escape responsibility because he only agreed to and did purchase the postage stamps with which the poison is sent to the victim, an act entirely lawful in itself, but punishable if done under an agreement among the conspirators and in carrying out the unlawful purpose of the conspiracy."  It is the agreement, not the overt act in furtherance of the agreement, which constitutes the offense.

> FN. The prosecution must plead and prove, in addition to a criminal agreement, an overt act (Pen.Code, §§ l 82, subd. (b), 184), and due process principles require that overt acts be pleaded with particularity to give the defendant notice of the prosecution's theory.  We need not reach the question whether the overt act is an actual element of the conspiracy.  The Attorney General relies upon cases holding that the jury need not unanimously agree upon the same overt acts.  Yet, the case law is in conflict on this point.  Other cases have held that the overt act is an element of the crime of conspiracy and jury unanimity is required.

Because overt acts need not be criminal offenses or even acts committed by the defendant, the description of the overt acts in the accusatory pleading does not provide notice of lesser offenses necessarily committed by the defendant.[FN] Moreover, inasmuch as overt acts may be lawful acts, the overt acts do not necessarily reveal the criminal objective of

the conspiracy.  For example, in the hypothetical posed by the Corica court, an alleged overt act of purchasing postage stamps provides no notice of even the charged target offense of murder, much less of a necessarily included target offense.[FN]

> FN. Indeed, in the present case some of the alleged overt acts were allegedly committed by Bird McCarlie or persons other than defendants Hamby or Frazier, and some acts were themselves lawful, e.g., talking about what was to be done with Hop, calling Hop a child molester.

> FN. We reject the Attorney General's argument that allegations of overt acts are analogous to enhancement allegations, which the Supreme Court has held are not part of the accusatory pleading for the purpose of defining lesser included offenses.  (People v. Wolcott (1983) 34 Cal.3d 92, 100-101 [assault with deadly weapon held not a lesser included offense under a charge of robbery with enhancement for use of a firearm].)  In Wolcott, the Supreme Court reasoned that (1) because an enhancement allegation becomes relevant only if the defendant is convicted of the substantive crime, a defendant may not be adequately notified, to satisfy principles of due process, that he must controvert the enhancement allegation to protect against a conviction for a lesser offense; and (2) because the jury determines the truth of an enhancement allegation only after it determines guilt on the charged or a lesser offense, this procedure would become muddled if evidence of the enhancement must be considered in determining guilt of a lesser offense.  Neither of these considerations applies to overt acts of a conspiracy.

In our view, it is the description of the agreement within the accusatory pleading, not the description of the overt acts, which must be examined to determine whether a lesser offense was necessarily the target of the conspiracy.  Here, the information alleged only that defendants conspired to murder Hop Summar. There is nothing in this terse description of the agreement to indicate an agreement with a lesser objective.  We therefore we [sic] hold that the trial court was not required to instruct the jury sua sponte on conspiracy to commit assault, battery, or mayhem as lesser

offenses included within the charged offense of conspiracy to commit murder.[FN]

> FN. The argument of Hamby and Frazier that the agreement was not, as alleged, to murder, but merely to assault, batter, or maim, is in essence an argument that there was more than one conspiracy: a conspiracy to assault, batter, or maim (of which Hamby and Frazier were a part) and a separate conspiracy to murder (of which Fenenbock and the other killers were a part).  However plausible this argument might have been at trial, it was not made.  No instructions were requested, and the trial court had no sua sponte duty to instruct upon this theory.

/////

Opinion at 19-23 (emphasis in original) (citations omitted).

### 3)     Applicable Law And Discussion

Frazier argues that "she was denied due process by the lower court's failure to instruct on lesser included defenses as mandated by California law."  Traverse at 2, FN 1.  Federal courts however are bound by a state appellate court's determination that an instruction was not warranted under state law.  See Bradshaw v. Richey, 546 U.S. 74,76 (2005) (per curiam) (noting that the Supreme Court has repeatedly held that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); Murtishaw v. Woodford, 255 F.3d 926, 956 (9th Cir. 2001) (deference must be given to a state supreme court's interpretation of state law governing a jury instruction), cert. denied, 535 U.S. 935 (2002).

Thus, "[n]ormally jury instructions in State trials are matters of State law." Hallowell v. Keve, 555 F.2d 103, 106 (3rd Cir. 1977) (citation omitted); see also Williams v. Calderon, 52 F.3d 1465, 1480-81 (9th Cir. 1995), cert. denied, 516 U.S. 1124 (1996). An instructional error "does not alone raise a ground cognizable in a federal habeas proceeding."  Dunckhurst v. Deeds, 859 F.2d 110, 114 (9th Cir. 1988) (citation omitted);

21

see also Van Pilon v. Reed, 799 F.2d 1332, 1342 (9th Cir. 1986) (claims that merely challenge correctness of jury instructions under state law cannot reasonably be construed to allege a deprivation of federal rights) (citation omitted).  A claim that a state court violated a federal habeas petitioner's due process rights by omitting a jury instruction requires a showing that the error so infected the entire trial that the resulting conviction violated due process.  Henderson v. Kibbe, 431 U.S. 145, 155 (1977); Menendez v. Terhune, 422 F.3d 1012, 1029 (9th Cir. 2005); see also Estelle, 502 U.S. at 72 (discussing due process standard).  In cases in which a petitioner alleges that the failure to give an instruction violated due process, her burden is "especially heavy," because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law."  Henderson, 431 U.S. at 155.  Frazier fails to meet this heavy burden.

        First, there is no clearly established federal law that requires a state trial court to give a lesser included offense instruction as would entitle Frazier to relief.  See 28 U.S.C. § 2254(d) (1); Beck v. Alabama, 447 U.S. 625, 638 & n. 7 (1980) (holding that failure to instruct on lesser included offense in a capital case is constitutional error if there was evidence to support the instruction but expressly reserving "whether the Due Process Clause would require the giving of such instructions in a non-capital case"); Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000) (per curiam) (in non-capital case, failure of state court to instruct on lesser included offense does not alone present a federal constitutional question cognizable in a federal habeas corpus proceeding), cert. denied, 534 U.S. 839; Windham v. Merkle, 163 F.3d 1092, 1106 (9th Cir. 1998) (failure of state trial court to instruct on lesser included offenses in non-capital case does not present federal constitutional question), cert. denied, 541 U.S. 950 (2004).  Accordingly, to the extent Frazier's argument is solely predicated upon the trial court's failure to give a lesser included offense instruction, this claim is not cognizable on federal habeas review

and should be denied on that basis.

Second, although "the defendant's right to adequate jury instructions on his or her theory of the case might, in some cases, constitute an exception to the [foregoing] general rule," Solis, 219 F.3d at 929, Frazier's was not such a case.  See Clark v. Brown, 450 F.3d 898, 904 (9th Cir. 2006) (state court's jury instructions violate due process if they deny the criminal defendant "a meaningful opportunity to present a complete defense"), cert. denied by Ayers v. Clark, 549 U.S. 1027 (2006) (quoting California v. Trombetta, 467 U.S. 479, 485 (1984)).

While Frazier devotes the majority of her argument to pointing out evidence presented by the prosecution that she argues supported the trial court's obligation to instruct the jury on lesser included target offenses, she does not cite specific examples of her testimony or argument that supported these instructions.  Nor does she dispute the State court's determination that "the record does not indicate that instructions on lesser target offenses were requested below."  Opinion at 19.  Frazier appears to be arguing that she was entitled to instructions which she did not request, on a defense theory that she did not argue.

Frazier however argues that her theory of defense was that she participated in a conspiracy to assault and batter Hop Summar.[2]  Traverse at 9.  Frazier argues that this theory was supported by her testimony, which established that she was sympathetic to Adcock and her statements about Hop and the molestation accusations, and by the fact that Frazier did not come forward to assist law enforcement.  Id.

On direct examination however Frazier testified that the first time Adcock raised the molestation allegations, Frazier was going to tell Adcock that she "didn't

---

[2] This argument does not appear in Frazier's second amended petition, or in the section of her traverse related to this claim, but instead in the section of her traverse discussing her claim concerning the lesser related jury instruction issue.

1  believe" the allegations against Hop, but "changed" her mind after Adcock "started to get

2  mad."  Reporter's Transcripts ("RT") at 3790.  On cross-examination, Frazier elaborated:

3           Q.     And can you - - can you describe that conversation
                 that created that fear in your mind?  What was it that
4                  she said?

5           A.     Well, it was on the 30th the first conversation or
                 statement that she made when she told me that, um,
6                  Rachelle had been molested.

7           Q.     Okay.

8           A.     And - -

9           Q.     Is that at the picnic table?

10          A.     Yes, we were sitting at the picnic table.

11          Q.     She starts to tell you this then - -

12          A.     Yes.  And in my mind I was thinking "Well, you know, I
                didn't think that Hop would do something like that from
13                what I had seen of him."  And I started to state the fact,
                you know, I told her, "Well, I don't believe that, you
14                know, that Hop would - -" and she kind of got upset.
                Then she got mad.

15  /////

16  RT at 3850-51.

17        With respect to an involvement in a conspiracy to assault and batter Hop,

18  Frazier testified:

19           Q.     Okay.  At any point did you ever tell Michael Sutton
                that you wanted Hop dead?
20
          A.     No, I did not.
21
          Q.     Okay.  Did you threaten to cut Michael Sutton with
22                your - - did you threaten to cut Gary Summar with your
                knife in Michael Sutton's presence?
23
          A.     No, I did not.
24
          Q.     Did you ever threaten to cut Gary Summar?
25
          A.     No, I did not.
26

Q.    Did you ask Michael Sutton at any point to become involved in the death of Gary Summar?

A.    No.

Q.    Did you ask Robert Jones at any point to become involved in the death of Gary Summar?

A.    No.

Q.    Did you tell Robert Jones you wanted Mr. Summar dead?

A.    No.

Q.    Did you tell Mr. Jones that you were going to cut him yourself?

A.    No, I did not.

Q.    Did you ever ask anyone for help using eye signals?

A.    No, I did not.

Id. at 3832.  On cross-examination Frazier denied remembering saying "Good" in response to Tex Lockley's statement, "It's been done."  Id. at 3864.   She recounted how she stopped April May Gault from assaulting Hop and testified that at no time did she agree that Hop was a child molester or that he "needed to be punished other than by law enforcement."  Id. at 3857, 3861.  With respect to Frazier's failure to come forward and assist the police, Frazier testified that she did not call the police after learning Hop had been killed because she "didn't want to end up like Mr. Summar."  Id. at 3831.

Frazier's testimony was consistent with her counsel's closing arguments which attacked the prosecution's investigation and the credibility of Jones and Sutton. Id. at 4851-74.  Those arguments in no way addressed or supported a theory that Frazier participated in a conspiracy to assault and batter Hop.  Id.

The only theory apparent from Frazier's testimony and closing arguments was that she did not say the words attributed to her by Sutton and Jones and that she was not part of any conspiracy to harm Hop.  Frazier did not request a jury instruction on

25

a lesser included offense and she did not present a theory of the case that involved a lesser included offense.  The trial judge's decision therefore did not deny Frazier her right to an adequate jury instruction on her theory of the case.

Finally, while Frazier's argument cites California law, and alleged facts she argues supported the instruction, she has not made a showing as to how the alleged failure to instruct had a substantial and injurious effect on the jury's verdict.  Frazier appears to be arguing that had the jury been instructed on lesser included offenses, the jury would have found her guilty of a lesser included offense, if at all, and not guilty of conspiracy to commit murder.  That argument is purely speculative.

The reality is that based on the evidence presented the jury found beyond a reasonable doubt that Frazier was guilty of conspiracy to commit murder.  Nothing in Frazier's argument establishes beyond pure speculation that had the jury been instructed on a lesser included offense, it would have altered the verdict.  Therefore, even assuming that Frazier had established that the trial court constitutionally erred in failing to give the instruction, and she did not, any such error was harmless.  See Brecht, 507 U.S. at 637-38; see also Clark, 450 F.3d at 905 (habeas petitioner must show that the alleged instructional error had substantial and injurious effect or influence in determining jury's verdict).

The state court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established constitutional law and Frazier is not entitled to relief on this claim.

B.   *Lesser Related* Jury Instruction

1)   Description of Claim

Frazier argues that evidence presented at the trial supported an instruction on the lesser related offense of being an accessory after the fact and that such a finding would have been "entirely consistent with the defense theory."  Traverse at 9.  Frazier

argues the trial judge's refusal to issue the instruction was "a denial of her federal and state constitutional rights to due process."  Second Amended Petition at 28.

        2)    State Court Opinion

The California Court of Appeal rejected this claim stating:

> Defendants Hamby and Frazier further contend that the trial court erred in refusing to instruct on the lesser related offense of being an accessory-after-the-fact.  Initially the prosecutor agreed that an instruction on accessory would be appropriate as to both the charged offenses, murder and conspiracy to murder.  The trial court indicated it would give the requested instruction, but following closing arguments, the trial court changed its mind, observing that neither defendant had relied upon the accessory theory.

> In <u>People v. Geiger</u>, <u>supra</u>, the Supreme Court held that in appropriate circumstances a requested instruction on a lesser related offense should be given.  The court identified three prerequisites to such an instruction: (1) there must exist some basis other than an inexplainable rejection of prosecution evidence, on which the jury could find the offense to be less than that charged; (2) the offense must be one closely related to that charged and shown by the evidence; and (3) the theory of the defense must be consistent with a conviction for the related offense.

> Defendant Frazier relies upon her testimony that after the murder Barbara Adcock asked for Frazier's help to see if there was any blood on the door or dashboard of the Ranchero.  Frazier checked and found none.  As the Attorney General correctly points out, there is nothing in this evidence to support a conviction for being an accessory.  Frazier did nothing to assist Barbara Adcock avoid capture or prosecution. She did not remove or conceal evidence.  The offense of being an accessory was not shown by the evidence, and no instruction on that offense was required.

>              * * * * *

> Defendants Frazier and Hamby further argue that even if an instruction on accessory was not required under <u>Geiger</u>, the trial court erred in withdrawing the instruction after having announced that it would be given.  Defendants rely upon <u>People v. Sanchez</u> (1978) 83 Cal.App.3d Supp. 1, 7, in which the court found prejudicial error in the trial court's belated decision to withdraw an instruction on a defense theory.  We reject the argument.

> Penal Code section 1093.5 requires the trial court to decide

upon the instructions before the commencement of argument.[FN]  However, any error is harmless if there was no hindrance to counsel's ability to argue the case.  The <u>Sanchez</u> case is readily distinguishable.  There, the trial court changed its mind in the presence of the jury in the midst of defense counsel's closing argument, requiring counsel to make abrupt changes in his argument and destroying defense counsel's credibility with the jury.

> FN. Penal Code section 1093.5 provides: "In any criminal case which is being tried before the court with a jury, all requests for instructions on points of law must be made to the court and all proposed instructions must be delivered to the court before commencement of argument. Before the commencement of the argument, the court, on request of counsel, must : (1) decide whether to give, refuse, or modify the proposed instructions; (2) decide which instructions shall be given in addition to those proposed, if any; and (3) advise counsel of all instructions to be given.  However, if, during the argument, issues are raised which have not been covered by instructions given or refused, the court may, on request of counsel, give additional instructions on the subject matter thereof."

Here, in contrast, the jury did not know that the theory of accessory had been withdrawn.  Nor were defense counsel hindered in their ability to argue the case.  Neither defendant relied upon the theory of being an accessory in closing arguments.  Counsel did not mention the offense, nor did either counsel focus on the evidentiary
basis for the crime of being an accessory.  We can see no prejudice from the trial court's belated decision to withdraw the instruction.

/////

Opinion at 24-27 (citations omitted).

3)      <u>Applicable Law And Discussion</u>

Frazier argues that the California Court of Appeal opinion did not discuss the evidence presented by the prosecution that supported an accessory after the fact instruction under California law.  Traverse at 9-10.  Federal courts however are bound by a state appellate court's determination that an instruction was not warranted under state law.  <u>See</u> <u>Bradshaw v. Richey</u>, 546 U.S. 74,76 (2005) (per curiam) (noting that the

1  Supreme Court has repeatedly held that "a state court's interpretation of state law,

2  including one announced on direct appeal of the challenged conviction, binds a federal

3  court sitting in habeas corpus."); Murtishaw v. Woodford, 255 F.3d 926, 956 (9th Cir.

4  2001) (deference must be given to a state supreme court's interpretation of state law

5  governing a jury instruction), cert. denied, 535 U.S. 935 (2002).

6         To the extent that Frazier is arguing that the trial court violated her

7  constitutional right to an instruction on accessory after the fact, there is no constitutional

8  right to an instruction based on lesser related offenses that are not lesser included

9  offenses under state law.  Hopkins v. Reeves, 524 U.S. 88, 96-98 (1998) ("Almost all

10  States ... provide instructions only on those offenses that have been deemed to

11  constitute lesser included offenses of the charged crime.  We have never suggested that

12  the Constitution requires anything more.") (citations omitted).  Frazier does not argue

13  that being an accessory after the fact to conspiracy is a lesser included offense of

14  conspiracy, and under California law being an accessory after the fact to murder is not a

15  lesser included offense of murder.[3]  People v. Majors, 18 Cal.4th 385, 408 (1998);

16  People v. Preston, 9 Cal.3d 308, 319-320 (1973).

17         To the extent Frazier is arguing that the trial court's decision adversely

18  impacted her defense, the Supreme Court has held that a denial of an opportunity to

19  make a closing argument violates a criminal defendant's constitutional rights.  Herring v.

20  New York, 422 U.S. 853, 862 (1975) (holding that statute authorizing trial judge in non-

21  jury criminal case to refuse to hear defense closing argument violated the Sixth

22  Amendment); see also United States v. Mack, 362 F.3d 597, 602 (9th Cir. 2004) ("It can

23  hardly be doubted that a defendant has a right to a closing argument.").  Further, the

24

25         [3] In fact Frazier argues that she was entitled to the instruction under California
   law because she was "entitled to instructions on lesser offenses which were not
26  necessarily included in the charge" and that "[a]ccessory after the fact was not included
   in the jury's charge."  Traverse at 10.

"[f]ailure to instruct on the defense theory of the case is reversible error if the theory is legally sound and evidence in the case makes it applicable."  Beardslee v. Woodford, 358 F .3d 560, 577 (9th Cir. 2004) (as amended); see also Bradley v. Duncan, 315 F.3d 1091, 1098 (9th Cir. 2002) ("[T]he right to present a defense would be empty if it did not entail the further right to an instruction that allowed the jury to consider the defense.") (internal quotation marks omitted); Conde v. Henry, 198 F.3d 734, 739 (9th Cir. 2000) (as amended) ("It is well established that a criminal defendant is entitled to adequate instructions on the defense theory of the case.").  A habeas petitioner must show however that the alleged trial error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637 (citation omitted); see also Beardslee, 358 F.3d at 578.

It is undisputed that Frazier's counsel presented a closing argument. Moreover Frazier does not argue that, by initially agreeing to issue the instruction and then reversing that decision after closing arguments had already been completed, the trial court prevented her counsel from "adequately representing" her.  Instead Frazier argues that if her counsel had made an accessory after the fact argument, only to have the trial court ultimately refuse to instruct the jury on that issue, it would have eliminated the defense's credibility with the jury.  Traverse at 10.  That argument however ignores the obvious fact that when given the opportunity Frazier's counsel did not present an accessory argument, and that it was only after that opportunity had passed that the trial judge decided not to issue the instruction, specifically because an accessory argument was not made.

Nevertheless, even if Frazier were to argue that the trial judge's decision somehow impaired her representation, that argument would fail.  It was only after Frazier's counsel and counsel for Frazier's co-defendant completed closing arguments that the trial judge announced that he "would not be giving the instructions on lesser

related offense and accessory after the fact." RT at 4974. Indeed it was Frazier's
counsel's closing arguments that caused the judge to reconsider the issue, and to
conduct further research, because the trial judge, "really expected [Frazier's counsel] to
be arguing an accessory after the fact theory in some form." Id. When the trial judge
"didn't hear anything about it" that caused him "to ponder and reflect." Id.

That reflection led to further research and the conclusion that under
California law the judge should not issue the instruction. Id. Deciding not to issue the
instruction after Frazier failed to present an accessory argument in no way prevented
Frazier from presenting her theory of the case. Further, not issuing the instruction did not
negatively impact the jury's verdict, because the jury heard no argument on the matter
and was totally unaware of the issue.

Neither Frazier's closing argument nor the jury's verdict was impacted by
the trial court's decision to not issue the instruction. Therefore, even if the trial court's
decision was an error, which it was not, Frazier's claim would still fail because she cannot
show that the decision had a substantial and injurious effect on the jury's verdict.

The state court's rejection of this claim was neither contrary to, nor an
unreasonable application of, clearly established constitutional law and Frazier is not
entitled to relief on this claim.

C.    Cumulative Error

1)    Description of Claim

Frazier argues that the trial court's failure to give instructions on the lesser
included and lesser related offenses, discussed herein, were cumulative error that
"rendered her conviction for conspiracy to commit first degree murder fundamentally
unfair and a denial of federal due process." Second Amended Petition at 30; Traverse at
12.

/////

1        2)      <u>Applicable Law And Discussion</u>[4]

2        In cases where there are a number of trial errors, the court may look at "the

3   overall effect of all the errors in the context of the evidence introduced at trial against the

4   defendant." <u>United States v. Frederick</u>, 78 F.3d 1370, 1381 (9th Cir. 1996) (quoting

5   <u>United States v. Wallace</u>, 848 F.2d 1464, 1476 (9th Cir. 1988)).  "In other words, 'errors

6   that might not be so prejudicial as to amount to a deprivation of due process when

7   considered alone, may cumulatively produce a trial setting that is fundamentally unfair.' "

8   <u>Alcala v. Woodford</u>, 334 F.3d 862, 883 (9th Cir. 2003) (quoting <u>Thomas v. Hubbard</u>, 273

9   F.3d 1164, 1180 (9th Cir. 2001)).

10       However, "where there is no single constitutional error existing, nothing can

11  accumulate to the level of a constitutional violation." <u>Fuller v. Roe</u>, 182 F.3d 699, 704 (9th

12  Cir. 1999), <u>overruled</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u> <u>Slack v. McDaniel</u>, 529 U.S. 473 (2000).  Here,

13  there was no single error committed and therefore there was no cumulative error.  Frazier

14  thus is not entitled to relief on this claim.

15  VI.   <u>CONCLUSION</u>

16       Accordingly, IT IS RECOMMENDED that petitioner's petition for a writ of

17  habeas corpus be denied.

18       These findings and recommendations are submitted to the United States

19  District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).

20  Within twenty-one days after being served with these findings and recommendations, any

21  party may file written objections with the court and serve a copy on all parties.  Such a

22  document should be captioned "Objections to Magistrate Judge's Findings and

23  Recommendations."  Any reply to the objections shall be served and filed within seven

24  days after service of the objections.  Failure to file objections within the specified time

25

26  ───────────────

    [4] There is no opinion by the state court as to this claim.

32

1  may waive the right to appeal the District Court's order. Turner v. Duncan, 158 F.3d 449,

2  455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).  In any objections he

3  elects to file petitioner may address whether a certificate of appealability should issue in

4  the event he elects to file an appeal from the judgment in this case. See Rule 11, Federal

5  Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of

6  appealability when it enters a final order adverse to the applicant).

7  DATED: May 20, 2010

8  _____
   CHARLENE H. SORRENTINO
9  UNITED STATES MAGISTRATE JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26